## Warfield Natural Gas Company v. Allen et al.

(Decided Feb. 14, 1933.)

648

KIRK & WELLS for appellant.
J. C. HOPKINS and C. P. STEPHENS for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Reversing.

The appellees, J. H. Allen and Octavia Combs, are the owners of the oil and gas in a certain 200 acres in Floyd county, and the appellant, Warfield Natural Gas Company, is the lessee by assignment. After setting up the relation of the parties and what plaintiffs regarded as the defendant's duties under the terms of the lease, the petition charges that the defendant negligently, unskillfully, and with wanton disregard of the plaintiffs' rights permitted a well which it was drilling to become flooded with water before the drilling had progressed as far as the "Big Lime," a stratum valuable and rich in both oil and gas, as was known to the defendant; that with such knowledge the defendant negligently and without regard for the plaintiffs' rights drilled into the stratum without casing off the water; that "a valuable, rich and productive flow of oil and gas was found"; that with wanton disregard of the plaintiffs' rights and interests in and to the oil and gas, the defendant proceeded with the drilling without making any attempt to save, market, or preserve the oil and gas; that the defendant negligently and knowingly permitted the accumulation of water in the well to seep and penetrate into said sand or stratum, thereby injuring and destroying it, wasting and destroying large and valuable quantities of oil and gas belonging to the plaintiffs, to their damage, in the sum of $25,000, which represented the value of their royalties or part of the oil and gas which could have been produced and marketed from the well "by the exercise of careful, prudent, skillful and ordinary means, and handling, according to recognized rules for the drilling, development and operation of oil and gas lands."

The answer admitted the relation of the parties

but denied negligence and the allegations of fact upon which the charge was based. The judgment was for $9,000 in favor of the plaintiffs, from which the appeal is prosecuted.

After drilling some 1,200 feet into the "Big Lime," oil was struck in such quantities that it gushed out over the derrick at the time and for a day or so afterward occasionally spurted out of the well. The company had not anticipated such finding and had not cased off the water so as to proceed into the oil with a clear hole, as plaintiffs contend they should have done. When oil was struck, the company regarded it as a small pocket, and, without attempting to case the well or save the oil, drilled several hundred feet deeper into what is called the "Brown Shale," where it expected to find and did find a large quantity of gas. So the case was resolved, in its essence, into a determination (1) whether the lessee exercised proper care and prudence in the manner of its operation or drilling, and (2) whether it should have developed the well for oil at the point reached instead of ignoring the oil and proceeding farther with the drilling. But both propositions rest upon the question whether the oil was there in paying quantities. If not, then the plaintiffs were not hurt by what the defendant did or failed to do.

Without presently noticing the evidence further, we may well look into the law by which the facts are to be gauged and the decision reached.

Actionable negligence consists of a duty, a violation thereof, and a consequent injury. The absence of any one of the three elements is fatal to the claim. Gosney v. L. & N. Railroad Company, 169 Ky. 323, 183 S. W. 538, L. R. A. 1916E, 458.

In the case before us, the duty is to be ascertained from the contract of the parties and its proper interpretation. The claim of a breach of that duty presents a more difficult problem because of the necessity of determining the proper standard by which the performance is to be measured. The matter of damages is also a formidable question because of its speculative nature; but the point upon which it seems to us the case must be decided obviates consideration of that question.

The duty is defined by both the express and implied terms of the contract. The lease, in the usual terms,

conveyed the oil and gas, granted to the lessor the right to use the premises for the purpose of operating for and producing oil, gas, and gasoline, including certain specific uses, and all privileges necessary and convenient for the purposes stated. The lessor was to receive one-eighth of the oil produced and saved, one-eighth of the manufactured casing head gasoline, and $300 a year "should a well be found producing gas only" so long as the gas is used or sold. Other provisions of the lease are not now material. Except as to the time in which to complete a well and the duration of the lease, and a restriction on location of wells, no attempt was made to define the manner or extent of operations.

It is a familiar principle in the law of contracts that, in the absence of specification of duties and obligations intended to be assumed, the law will imply an agreement to do and perform those things that according to reason and justice the parties should do in order to carry out the purpose for which the contract was made. Humphreys v. Central Kentucky Natural Gas Company, 190 Ky. 733, 229 S. W. 117, 21 A. L. R. 664. Though not expressed in the instrument, the law wrote into it as by implication certain covenants in order to manifest the purpose of the parties. They are just as effectual and binding as if specified. Among them is the obligation that the lessee would test and develop the property in good faith, and with reasonable diligence, to obtain production, and that it would prosecute operations diligently and prudently. Willis' Thornton on Oil and Gas, sec. 503, 40 C. J. 1064; Flanigan v. Stern, 204 Ky. 814, 265 S. W. 324; Union Gas & Oil Company v. Diles, 200 Ky. 188, 254 S. W. 205; Bay State Petroleum Company v. Penn Lubricating Company, 121 Ky. 637, 87 S. W. 1102; Dinsmoor v. Combs, 177 Ky. 740, 198 S. W. 58, 59. These implied obligations include that of exercising good faith and the sound discretion of a prudent operator to drill to a depth that is reasonably necessary to test the land. Texas & Pacific Coal & Oil Company v. Stuard, (Tex. Civ. App.) 269 S. W. 482; Kies v. Williams, 190 Ky. 596, 228 S. W. 40; Bradshaw v. Hurt, 198 Ky. 38, 247 S. W. 1113; Sugg v. Williams, 191 Ky. 188, 229 S. W. 72.

This broad implied provision or covenant contemplates that, if oil is discovered in paying quantities, or

it reasonably appears to be there in paying quantities, the lessee will proceed with the operations and development so as to obtain full production in order that the lessor may receive his royalty. It likewise contemplates. that the lessee will protect the premises against loss or drainage of the oil. Lawrence Oil Corporation v. Metcalfe, 241 Ky. 353, 43 S. W. (2d) 986.

The reasonableness of the diligence and course of conduct with respect to the extent of the prosecution of the operations is to be measured by what would be done under the same or similar circumstances by operators of ordinary prudence and diligence having regard for the common rights and mutual advantages of both parties to the contract and not of the lessee or operator alone. Willis' Thornton on Oil & Gas, sec. 167; Rains v. Kentucky Oil Company, 200 Ky. 480, 255 S. W. 121; Austin v. Ohio Fuel Oil Company, 218 Ky. 310, 291 S. W. 386; Lawrence Oil Corporation v. Metcalfe, supra; Becker v. Submarine Oil Company, 55 Cal. App. 698, 204 P. 245; Strange v. Hicks, 78 Okla. 1, 188 P. 347; Jacob v. Stephenson (Tex. Civ. App.) 254 S. W. 1117; R. E. Taylor Syndicate v. James (Tex. Civ. App.) 243 S. W. 1105; Prince v. Standard Oil Company, 147 La. 283, 84 So. 657; Goodwin v. Standard Oil Company (C. C. A.) 290 F. 92; Jennings v. Southern Carbon Company, 73 W. Va. 215, 80 S. E. 368.

For a breach of any of the duties contained in the covenants of the lease, the lessor may ordinarily recover commensurate damages, the burden, of course, being upon him to show his damage. Carroll Gas & Oil Company v. Skaggs, 231 Ky. 284, 21 S. W. (2d) 445; Willis' Thornton on Oil & Gas, secs. 154, 180, 183, 500; Notes 19 A. L. R. 450.

In order to ascertain whether there has been a breach of any of these duties, we need to go a step further, for the law relating to the subject of oils and gas has some features peculiar to itself. Looking to operations and development in general, it will be found that there are and must be distinctions in the law with respect to gauging the different character of acts of omission on the part of the lessee; as, for instance, where he does not begin operations, or where he has practically or fully abandoned the venture after a partial or half-hearted effort toward development, on the one hand, and where he is proceeding in good faith to

develop the property. Thus in Reynolds v. White Plains Oil & Gas Company, 199 Ky. 243, 250 S. W. 975, 976, the attitude of this court is stated to be:

> "Our rule is to protect the good faith lessee who is prosecuting work for development with reasonable diligence against the cancellation of his lease, but to apply the strict rule to the mere speculator who would take long term leases, holding them without development in the hope that others may explore the region and make the holdings valuable without effort or expenditure upon his part."

Again is there a difference in the attitude of the courts with respect to the consideration to be given the lessee's discretion and judgment, where there have been apparently good faith operations and development. The distinction, broadly stated, is between the extent of development in the one instance and the manner of development in the other.

Under some circumstances, such as when the question is whether or not there should be further development or more extended exploration after oil or gas has been found in paying quantities, it is held that though the lessee may have acted in good faith, he is liable under his contract if he did not proceed as the reasonable, prudent operator would have done; but in such cases the discretion and judgment of the lessee is entitled to and will be given great weight and consideration, although it is not accepted as conclusive. Willis' Thornton on Oil & Gas, secs. 154, 157, 167, 173; 40. C. J. 1066; Rains v. Kentucky Oil Company, supra; Austin v. Ohio Fuel Oil Company, supra. But we may leave this branch of the law for our concern is with the other aspect, and we proceed along that divergent track.

Where it is a question of fact as to whether oil has been found in paying quantities, or whether the productiveness of the property is sufficient to justify further development or operations after discovery of oil, the discretion and judgment of the lessee will be accepted as conclusive unless fraud or bad faith is shown. 40 C. J. 1066; Willis' Thornton on Oil & Gas, secs. 231, 232, 235. In section 490 of that excellent work, in treating the right of a lessor to cancel the lease, it is said:

> "If * * * oil or gas has been produced by the lessee

on the premises, then whether or not it is being produced in 'paying quantities' is a question of fact; but the lessee is the judge as to what amount of oil or gas constitutes 'paying quantities' if he exercise his judgment in good faith. Thus in one case it was said: 'And whether or not oil is found in paying quantities is, furthermore, to be determined exclusively by the operator, acting in good faith and upon his honest judgment. We do not mean an arbitrary judgment, or one springing from an ulterior purpose to get some unfair or dishonest advantage of the landowner, but a judgment arrived at by acting in good faith upon sound business principles. But, as in other cases, fraud will not be presumed, and becomes provable only under proper averments. Therefore, under the pleadings and proof of this case, it was error in the court to submit to the jury the question whether oil was found in paying quantities. Any quantity would pay the landowner for it would have cost him nothing. Under such a contract it is he who puts up the stake, and has to reckon with profit and loss, that shall decide, and not he who takes no risk, but receives a chance to be enriched at the expense and enterprise of another.' "

The idea which has ruled the courts seems to be that, if the matter is one of judgment—to do or not to do—as between the man who must hazard his money and the man who has much to gain and little or nothing to lose, the former's judgment should be accepted unless it be shown that his choice was made or action taken arbitrarily, in bad faith or to defraud the lessor. Some of the cases adhering to this rule are: Colgan v. Forest Oil Company, 194 Pa. 234, 45 A. 119, 120, 75 Am. St. Rep. 695; Young v. Forest Oil Company, 194 Pa. 243, 45 A. 121; Barnard v. Monongahela Natural Gas Company, 216 Pa. 362, 363, 65 A. 801; Kellar v. Craig, 126 F. 630, 61 C. C. A. 366; Manhattan Oil Company v. Carrell, 164 Ind. 526, 73 N. E. 1084; Osburn v. Finkelstein, 189 Ind. 90, 126 N. E. 11; Gilbert v. Bolds, 62 Ind. App. 595, 113 N. E. 379; Grubbs v. McAfee, 109 Tex. 527, 212 S. W. 464; Masterson v. Amarillo Oil Company (Tex. Civ. App.) 253 S. W. 908; Ohio Fuel Supply Company v. Shilling, 101 Ohio St. 106, 127 N. E. 873; Bucher v. Plymouth Oil & Gas Company, 107 Ohio St. 73, 140 N. E. 940; Grass v. Big Creek Development

Company, 75 W. Va. 719, 84 S. E. 750, L. R. A. 1915E, 1057; Steel v. American Oil Development Company, 80 W. Va. 206, 92 S. E. 410, L. R. A. 1917E, 975; Allen v. Colonial Oil Company, 92 W. Va. 689, 115 S. E. 842; Bowers Co. v. Kanawha Valley Products Company, 100 W. Va. 278, 130 S. E. 284.

This liberality toward the lessee is by no means uniform and some courts hold that neither the lessor nor the lessee is the sole arbiter as to the reasonableness of the continuing prosecuting of the development of the property. Willis' Thornton on Oil & Gas, sec. 235; Summers Oil & Gas, sec. 136. The principal case so holding, and one extensively cited, is Brewster v. Lanyon Zinc Company, 140 F. 801, 72 C. C. A. 213.

But that liberal rule of accepting the operator's judgment has been recognized by this court in several cases involving the right to cancel or rescind a lease for a violation of the covenants upon the ground that it was still producing in "paying quantities." Bay State Petroleum Company v. Penn Lubricating Company, 121 Ky. 638, 87 S. W. 1102; Reynolds v. White Plains Oil & Gas Company, 199 Ky. 243, 250 S. W. 975; Swiss Oil Corporation v. Risner, 223 Ky. 397, 3 S. W. (2d) 777; Hughes v. Busseyville Oil & Gas Company, 180 Ky. 545, 203 S. W. 515; Union Gas & Oil Company v. Diles, 200 Ky. 188, 254 S. W. 205; Rains v. Kentucky Oil Company, 200 Ky. 480, 255 S. W. 121; Austin v. Ohio Fuel Oil Company, 218 Ky. 310, 291 S. W. 386; Union Gas & Oil Company v. Wiedeman Oil Company, 211 Ky. 361, 277 S. W. 323.

In this jurisdiction production in "paying quantities" as used in this connection is held to mean such quantities as are susceptible of division between the parties and as will yield a royalty to the lessor that justifies the occupancy of and interference with his use of his lands by the operations. A mere showing of oil is not sufficient. Enfield v. Woods, 198 Ky. 328, 248 S. W. 842; Reynolds v. White Plains Oil & Gas Company, supra; Sawyer v. Potter, 223 Ky. 359, 3 S. W. (2d) 758.

Perhaps we should consider also what is meant by "good faith" or "bad faith" and "fraud" in these connections, although they are terms which ordinarily carry their own meaning. A definition of "good faith" given in Bouvier's Law Dictionary is:

"An honest intention to abstain from taking any unconscientious advantage of another, even through the forms and technicalities of law, together with an absence of all information or benefit of facts which would render the transaction unconscientious."

"Bad faith" is, of course, the antithesis. Though an indefinite term, it differs from and is stronger than the idea of negligence in that it contemplates a state of mind affirmatively operating with a furtive design or with some motive of self-interest or ill will, or for an ulterior purpose. 1 Words and Phrases, Third Series, page 759. There seems to be but little difference between "bad faith" and "fraud" in this particular relation. Fraud may be said to be an action of a more affirmative evil nature, as proceeding or acting dishonestly, intentionally, and deliberately, with a wicked motive, to cheat or deceive the lessor in respect to the situation or operations or results to his damage or loss and to the lessee's advantage or gain.

The foregoing opinions deal principally with the duration, cancellation, or rescission of the lease and not with a tort based upon a breach of duty imposed by the contract, such as we have before us here. We are not aware of any case presenting the precise conditions and claims, but it seems to us the same principles should control as where the lessee was under obligation to develop the property further after discovery of oil, for the ultimate issue here was whether at the time the facts warranted a fair and reasonable conclusion that the well was a producer of oil in paying quantities or in such a quantity as required its conservation, immediate and prospective, instead of proceeding with the drilling in such manner as resulted in the loss of the oil to the lessors, even though the deeper drilling produced gas and enables them to collect $300 a year for such a well.

But even with the application of so liberal a doctrine as outlined above, it will not do to say the operator or lessee's determination is final and not subject to judicial review. That would lead to results clearly not contemplated by the contract of the parties or the rule of the courts. Daughetee v. Ohio Oil Company, 263 Ill. 518, 105 N. E. 308. The rule relates to the consideration to be given the evidence, for there yet re-

mains the question of good or bad faith, and fairness or fraud. As stated in Colgan v. Forest Oil Company, supra, the courts are authorized to interfere "when a manifestly fraudulent use of opportunities and control is shown."

We revert to a consideration of the evidence, for the purpose of determining whether the plaintiffs, standing in the shoes of the lessor, carried the heavy burden they had to assume of proving that the defendant as the lessee acted in bad faith or fraudulently in the way in which they had the well drilled and in failing to develop it as an oil producer.

At the time the immediate territory was regarded as "wild cat" so far as the oil production was concerned, for very little oil had then been discovered in Floyd county, although it was known as a large gas field. Some oil had been discovered a mile or more distant, but a well about 1,500 feet away was brought in shortly before this drilling began and produced gas only. The "Big Lime" is a thick, hard sandstone, of poor porosity, underlying the surface some 1,200 feet down. It seems to have been the general custom in the county to set the casing on or near the top of this stratum and to proceed with the drilling with the water thus shut off. The drillers of the well involved had before them the log of the nearby well (in which the casing had been set according to the custom), and they learned from it that after going 92 feet into the "Big Lime" much water was encountered so that it became necessary to draw the casing and either ream the hole or reduce the casing in order to avoid the water. Considerable expense had been necessarily incurred by reason of this manner of drilling or placing the casing. Profiting by that experience, the appellant thought it better to continue the drilling into the "Big Lime" until the shaft reached a depth below where the water had been found in the other well and then set the casing. However, after going 49 feet into the "Big Lime" oil was encountered. The gas blew out the oil and water above the derrick, and, as stated in the early part of this opinion, the flow continued intermittently for two or three days. The plaintiffs seeing this and the oil being wasted and regarding it as a valuable find, called upon the local manager of the defendant to save the oil. They were advised that oil had not been found

in paying quantities and that only a pocket had been struck. The defendant's agents in the field, as well as the drillers employed by it, had had long experience in this line of work. They made what they say was the customary and usual tests and inspections by baling the well and found there were fifteen or sixteen barrels of oil on top of perhaps 1,000 feet of water. This, taken into consideration with surrounding circumstances and conditions and their knowledge of the nature of the "Big Lime" stratum, caused them to decide that there was only a pocket of oil and that it was not present in paying quantities. Thereupon, the drillers were directed to proceed without casing off the water and they did so without having any regard for the presence of oil. Finally when the "Brown Shale" was struck, quite a distance below, gas in paying quantities was found just as it had been expected.

The plaintiffs maintain that this was wrong. There is some evidence that the driller was advised to put out the fire in case he should encounter a flow of oil, and this indicated an expectation contradicting the claim that no oil was anticipated. Accordingly, it is said that the casing should have been put in on top of the "Big Lime" and, certainly, that when oil was discovered, the water should have been cased off and the oil saved. The evidence was of necessity of the opinion class. Nobody can peer into the bowels of the earth and know exactly what is there. Cf. Kentucky Glycerine Company v. Woodruff Development Company, 233 Ky. 325, 25 S. W. (2d) 736. There was a diversity of opinion expressed by the oil fraternity and geologists who testified as to the exact nature of the "Big Lime." Some claimed that oil is present in that stratum in pockets or crevices in comparatively small quantities and it was not to be expected in paying quantities. Others were of the opinion that oil should reasonably have been expected in profitable quantities. There is some diversity also as to whether prudent drillers should have been guided altogether by the log of the nearby well or should have considered it only in connection with the experience of other wells, which, as stated, were a mile or more away. Even those witnesses who regarded it as reasonable prudence and intelligent operation to be governed by all the widespread conditions, say that great importance and value are to be accorded the experience of the closest well, although it is not in itself

·controlling. Again is there conflict in the evidence as to whether proper and sufficient tests were made to ascertain the quantity of oil present in the well; and also as to whether or not the conditions which were displayed indicated as a fact that oil was present in paying quantities. One of the reasons for the opinions sustaining the plaintiffs' claim was the fact that the well a mile away in which they owned the royalty interest had been very profitable as an oil producer. It does not seem to have become such until after the time and occurrences with which we are here concerned. So, after all, it was a matter of judgment to be exercised by the lessee, and though there were reasons shown for regarding the well as producing oil in paying quantities, there were at the same time equally or more persuasive reasons for believing it not to be so.

The case of Texas & Pacific Coal & Oil Company v. Stuard (Tex. Civ. App.) 269 S. W. 482, 486, is something like the instant one on the facts, in that the evidence tended to show mismanagement upon the discovery of oil and gas before completion of the well, and the legal principle we have been discussing was applied. It was claimed by the plaintiffs that the first well drilled on the lease encountered a large quantity of oil and gas before reaching the depth contemplated; that the defendant put a control head on the casing to close it and the tremendous pressure lifted the string of casing out of the hole and up through the derrick a hundred feet or more; that the control head finally blew off, and with the pressure relieved the casing dropped back into the hole, collapsed, and ruined the well; also that by reason of the raising of the casing salt water had entered the well and the defendant had permitted it to remain and had refused to keep the well in repair; that the well was ruined by the negligence and mismanagement of the defendant. It was also charged that a second well was drilled and oil struck, but through negligence of the defendant in attempting to case the well, the casing was dropped and the well ruined; that had it been properly handled the well would have produced oil in paying quantities to the plaintiff's benefit. And another claim was that the defendant was under further obligation to develop the property with diligence, but it had failed and refused to drill and complete a well in a workmanlike manner, to the plaintiffs' great daamge. On the facts, it was held by the court

that there was evidence that the dropping of the casing had not injured the well and that it had produced oil and gas in a limited quantity, but that both parties seemed to recognize that it had not gone deep enough to prove the territory and was not a fulfillment of the contract and it had been subsequently agreed that another well would be drilled. As. to well No. 2, the evidence showed that the experience in the adjacent territory supported the finding of the trial court, that the lessee had exercised good faith and discretion in its conclusion that it would not be profitable to it to drill deeper the two wells sunk on the lease or to put another well on it. Said the court:

"The implied obligation on the part of a lessee, under a contract like the one under consideration, is to exercise good faith and sound discretion to drill to a depth that is reasonably necessary to test the land. The lessee is not required to peer down into the soil with an X-ray vision and determine whether at any depth there can be found oil or gas, but merely to exercise good faith and sound discretion as to whether oil or gas may be found."

The argument is made that the well with which we are concerned might have been developed and operated as a combined oil and gas well. There is evidence that the oil could have been saved and the drilling have proceeded deeper and the gas also procured by the use of double piping. Passing the question of the right of determining the presence of oil in paying quantities, we may note that the lease did not contemplate such a combined well. Its terms indicate that the parties had in mind either an oil or a gas well. Royalties were specified for oil, for casing head gasoline, and a fixed annual payment "should a well be found producing gas only." There was no compensation provided for gas produced along with oil. The lease involved in Hennessy v. Junction Oil & Gas Company, 75 Okla. 220, 182 P. 666, was like this one in that the stipulated royalties were a fractional part of the oil and $100 per year for each well "if gas only was found in quantities large enough to transport." It was contended as a ground of forfeiture of the lease that the lessee had made no effort to discover oil and had brought in a gas well merely for the purpose of extending the life of the lease. When considerable gas was struck in the drilling, the well was

packed and shut down but afterwards connected with the pipe line. Applying the rule of accepting the judgment of the operator, the court held that, if the lessee in good faith honestly attempts to discover oil, but, failing to find it, should find gas in paying quantities, the lease would be continued as provided by its terms; and that the plaintiffs had not met the burden of showing the lack of good faith and denied their claims of a forfeiture.

It is a matter of potent significance that the plaintiffs seem to have concurred in the conclusions of the defendant after receiving its response to their request as to the well. They did nothing more. The defendant proceeded with the drilling until the well was completed without the plaintiffs taking any legal action to protect whatever rights they may have felt they had. They appear to have acquiesced in the judgment of the defendant for some time afterward, even to the extent of accepting the stipulated payment for a gas well only. See Bay State Petroleum Company v. Penn Lubricating Company, 121 Ky. 637, 87 S. W. 1102.

Our conclusion of the whole matter is that the plaintiffs failed to produce any probative evidence that the defendant in making a choice and determining its course acted so unreasonably or arbitrarily that it could be said it failed to exercise an honest judgment or was unfaithful in the discharge of the implied duties devolving upon it by the virtue of the lease, although it be conceded there was evidence that the defendant failed to exercise ordinary care or even such degree of care as the owners may have believed was demanded by reason of their hopes or expectations aroused by the bursting out of the oil from what appeared on the surface to be a rich gusher. Hence, it is the opinion of the court that a peremptory instruction should have been given the jury to find for the defendant.

Wherefore the judgment is reversed for consistent proceedings.

Whole court sitting.